## ST. LOUIS & S. F. R. CO. v. CHAPMAN.

(Circuit Court of Appeals, Eighth Circuit.    July 14, 1905.)

No. 2,086.

1. RAILROADS—INJURY OF PERSON AT CROSSING—PRESUMPTION OF NEGLIGENCE.

The fact alone that a person who was walking is found dead beneath a railroad engine at a grade crossing raises no presumption that those operating the engine were negligent or in fault for the killing, and the burden rests upon one alleging such negligence to prove the same.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, § 1119.]

2. SAME—CONTRIBUTORY NEGLIGENCE.

On the arrival of a regular passenger train at a division station in the night, it was the custom of the railroad company to detach the engine and run it ahead across a street crossing the tracks near the station, and to bring it back on another track on its way to the roundhouse, while, at the same time, another engine, which was in waiting across the street, was backed up and attached to the train. The company did not maintain a watchman at the crossing in the night, and there was no electric light over it. Plaintiff's intestate, who was a man 45 years old and accustomed to taking such train, and presumably familiar with such facts and customs, started to go over the tracks at the crossing, which were six in number, after the train came in, and was struck and killed by the detached engine, which backed up a short distance behind the other engine and on an adjoining track. The space between the two tracks, some nine feet, was planked, and deceased was seen standing in such space when the forward engine passed. The engines carried no lights at the rear of the tenders, but both bells were being rung automatically. No one saw the deceased struck. *Held* that, under the facts and circumstances shown, deceased was chargeable with contributory negligence, which precluded a recovery from the railroad company for his death.

8. SAME—PRESUMPTION OF CARE.

The doctrine that a person is presumed to have exercised due care to protect himself from injury, if applicable at all in the case of a person who goes upon a railroad crossing at night, where there is known danger from moving engines on the tracks, is only so in the absence of any testimony explanatory of his conduct at the time and of the manner of his injury.

In Error to the Circuit Court of the United States for the District of Kansas.

This is an action by the administratrix, the widow, of Charles S. Chapman, to recover damages for his death, alleged to have been caused by the negligent act of the plaintiff in error, the St. Louis & San Francisco Railroad Company. The case was tried to a jury, which returned a verdict of $8,000 in favor of the defendant in error. The accident occurred on the 15th day of January, 1902, at the intersection of Wall street with the tracks of the railroad company in the city of Ft. Scott, Kan., approximately between 2:40 and 3 o'clock in the morning. The imputed grounds of negligence on the part of the railroad company were in backing its engine across said Wall street from the south, northward, without any light on the tender or back part of the engine, and without any light anywhere on said engine that could be seen by a person approaching said crossing from the west, and without any brakeman, or switchman, or guard, or lookout of any kind on said engine. The answer tendered the general issue, with a plea of contributory negligence.

The deceased was 45 years old, a strong and intelligent man. The evidence tended to show that he was well acquainted with the crossing of the tracks of the railroad company over said Wall street, and that his business for years past frequently took him from his home in Pittsburg, Kan., to and

through Ft. Scott, and that he was in the habit of taking passage on the train in question, due 'to arrive at that hour of the night. He arrived at Ft. Scott the evening prior to the accident, and went to the Tremont hotel located on Wall street, three blocks west of the railroad, as was his custom, where he waited the arrival of 'said train coming from the north, and walked therefrom direct toward the depot station, carrying two hand grips or satchels. Wall street runs east and west, crossing the tracks, which run north and south, about 160 feet south of the passenger station. After he left the hotel, walking east upon the south sidewalk on Wall street, and just before reaching the railroad, he passed in front of the Kennedy Block, close to the westernmost track of the railroad. In front of this hotel was a small incandescent electric ,light. Wall street is about 75 feet in width, with a street car track in the center thereof. The sidewalks on the street cross six tracks of the railroad company in going to the depot, the easternmost of which is the main track, called by some of the witnesses the "new belt track.". The next track to it on the west is called the "coach track," or "passing track." The accident occurred on the latter track. The distance between the two tracks was about 9.4 feet, leaving a 5 or 6 foot space between trains passing on them. This space where the accident occurred was planked, and used by passengers when trains were on both tracks. Immediately east of the main line of the railroad, on the south side of Wall street, about 120 feet from and east of the Kennedy Block, was a brick block, in front of which there was a small arc light, about 20 feet from the east track. Directly north of that block, on the north side of Wall street, and close to the main line, was the passenger station, in front of which was another electric light. During the day, and until 10 o'clock at night, there was a gateman at the crossing to let up and down the bars, indicating the presence or absence of trains; but there was never any such watchman after 10 o'clock at night.

A short time before Chapman started to the station a passenger train of the railroad came in from the north, and was standing on the main track in front of the station, which had in it the usual lights. That train was to go on south; and, as Ft. Scott was a division point, engines were regularly changed there. As soon as the train stopped, a switchman would uncouple the engine, standing close to Wall street on the north side, which would then be run south across the street to a switch which took it from the main track westerly over upon the coach track, on which it was to proceed north to the roundhouse. Before said train came in, as was the usual custom, the engine known in the evidence as "No. 236," which was to pull the train on south, had moved south across Wall street, and was stationed on a spur which ran out of the main track on the east side, called "cement spur." The engine which brought the train in is known in the evidence as "No. 98." As soon as it had been uncoupled and went south past the cement spur, the fireman of engine 236, with his lighted lantern in hand, dismounted therefrom and, walking north a short distance to the cement spur, about 20 or 30 feet south of Wall street, threw the switch, so that the engine would move into the main track, and signaled the engineer to back up north to be coupled to the passenger train. The engine, on his signal, moved north to and over said walk, partly across Wall street, stopping about the middle thereof, with the engineer in the cab on the west side, with his head out looking northward. The fireman then walked back south and threw .the switch again for the main line. Engine 98, in the meantime, had moved south about 500 feet from Wall street, where it was switched upon the coach track, which was thrown by the switchman, Baughman, who, after replacing the switch, mounted the engine as it moved north, riding in the gangway (the opening between the cab and the tender), in his customary place, on the west side. Both engines were lighted in front with electric lights, and there were small lights in each engine cab. with lanterns; and the bells on each of said engines, which, rang automatically, were ringing during all of these movements.

Mr. Chapman was seen by a witness passing the Kennedy Block, walking along the south sidewalk on Wall street in the direction of the station. He had reached a point between the main track, on which engine 236 was moving, and the next track, on which engine 98 was moving, and was standing there when engine 236 moved by him going north. That engine passed

him and stopped with its front about the middle of the street, which brought the north end of the tender near the train to which it was to be coupled. Engine 98, moving in the same direction on the coach track, was following engine 236, but did not reach Wall street until engine 236 had passed the south sidewalk. No one on engine 98 saw any one on the track in Wall street, though they were looking ahead. The motion of the tender led them to suspect that something was wrong about it, when the engineer stopped his engine in the street; and, on investigation, Mr. Chapman's body was found between the driving wheels on the east side of engine 98, and his grips were on the planks between the main and coach tracks, between the south sidewalk on Wall street and the street car track, near the point where the engineer on 236 saw him just a few minutes before, and his hat lay near the grip sacks. The night was quite dark. There was no light or watchman on the tender of either engine as they backed across the street. The engines moved slowly across the street.

Errors are assigned to certain portions of the charge delivered by the court to the jury, and to its refusal to direct a verdict for the defendant.

I. P. Dana and James Black (J. G. Egan, L. F. Parker, and W. F. Evans, on the brief), for plaintiff in error.

Morris Cliggitt (J. I. Sheppard, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

When a person is found dead beneath a moving engine of a railroad, along its ordinary right of way, no presumption arises that his death was occasioned by the culpable negligence of those operating the engine. The presumption is that the operators were without fault, and the burden throughout rests upon him who asserts the contrary to establish it by satisfactory proofs. Nothing can be inferred from the bare fact that a foot passenger is knocked down by a carriage in a place where they have an equal right to be, or by a train at a level crossing. Webb's Pollock on Torts, 545-547; Wakelin v. L. & S. W. R. Co., 12 App. Cas. 41.

While it may be conceded that, in so far as the general public was concerned, having occasion to use the Wall street crossing at the time and place of this accident, the city or the railroad company, or both, might have been derelict in considerate precaution in not maintaining an electric light, or some other assisting light, or a watchman, to warn parties of the passing of engines, yet in determining this case regard must be had to the duties of both the railroad company and Chapman, keeping in view the knowledge of each of the situation, the customary method of the movement of engines, and what would reasonably be expected of Chapman in approaching said crossing. On the one hand, the long-established practice of the railroad was not to maintain an arc light at said crossing, or a watchman there after 10 o'clock at night. It was also the long-established custom of the railroad company at that station, which was a division point, on the arrival of the train due at that time of night, to detach the engine drawing the incoming train, run it across the street down south, as the evidence shows, and back again over the street to the roundhouse, and simultaneously, or

nearly so, therewith bring the engine in waiting across the street, to be attached to the train of cars standing at the station. These switching movements were conducted in the usual manner on the occasion in question. On the other hand, the evidence warrants the conclusion that the deceased was familiar with the general facts aforesaid. For a considerable period anterior to the accident he was in the habit, in going to and fro, of taking the train due to arrive and depart at the time and place in question. Frequently he would arrive at Ft. Scott at 8 or 9 o'clock in the evening from some other train, go to the same hotel, await the arrival of said train coming from the north, and then go to the depot to take the train for his home in Pittsburg, Kan. He was necessarily familiar with the location and the number of tracks, the changing of engines, and the method of switching them. He must have known that there was no arc light or watchman maintained at said crossing at that hour of the night; and, as the evidence shows, that such switching had hitherto uniformly been done without any light or watchman on the tender of such engines, such fact could not reasonably be presumed to have escaped his observation. With all this knowledge, he saw fit, as the evidence tends to show, to remain at his hotel until he barely had time to walk to the station to board the train before it would move out.

The obligation of the railroad company must be viewed in its relation to such a pedestrian attempting then and there to cross its tracks. He had no right to assume that the conduct of the business of the railroad company would be any wise different from what it had hitherto been. The dangers in approaching such a place were as much known to himself as to those in charge of the moving engines. The law of the land exacted of him a degree of circumspection and caution in approaching such a place, commensurate with the danger to be reasonably anticipated. If the night was so dark as to obscure his vision, the law all the more required of him to call into requisition his sense of hearing. In view of all the facts and circumstances in evidence, it challenges our comprehension how Chapman, a man of intelligence, with good sight and hearing, familiar with the situation, could have failed to be aware of the presence of said engines, if he was in the exercise of due care on his part. The very situation, of which he must have been conscious, was calculated to quicken his sense of alertness and excite his apprehension. The electric headlights on the engines were ablaze, which the evidence shows radiated on either side from 6 to 10 feet from the head of the engines, and widened as the distance in front increased. Why a person approaching said crossing, as did Chapman, who must have heard the bells ringing on the engines, if he was listening, could not have seen this radiating light from the engines, is inexplicable. The engineers in charge were complying with the statutory requirement by constantly keeping the bells ringing while the engines were in motion about said crossing.

It is a conspicuous fact that every other person who was found to have been going to the station at the same time, in approaching

said crossing from the same side on which Chapman approached it, had his attention directed to the movements of these engines. The hackman, who approached the crossing about the time Chapman did, discovered the presence of these engines at said crossing in time to avoid collision with them. While he testified that he did not discover the presence of the engines until almost at them, as he was quite familiar with the custom of said switching programme, he would have been guilty of most culpable negligence had he gone against them without stopping his hack to take scrutinizing observation. Chapman was seen by one of the witnesses going toward the same station, going on the sidewalk from the Tremont House, in advance, in the same direction, immediately before the accident. It is quite immaterial, for the purpose of determining the movements and conduct of Chapman at the time, whether or not said witness was mistaken in stating that he saw the glow of the headlights in the engines as they approached the crossing. The fact remains that he did see the movements of the engines, and was aware of their approach to and over the crossing.

There is another uncontradicted and important fact disclosed in the evidence. The fireman on engine 236 testified that, with a lighted lantern, he threw the switch, when the engine was south of the street, to let engine 236 pass; that he then went to the sidewalk of Wall street with the lantern in his hand to take observation to see if any one was on or about the crossing. He then returned to the switch and gave the signal to the engineer of 236 to back up. After this engine passed the switch he was detained a short time on account of some disarrangement about the switch, and while so engaged engine 98 passed him going to the crossing, just behind engine 236. All this occurred while engine 98 was south of the crossing. The switchman was thus in the open, with his lighted lantern south of Wall street, while Chapman was approaching the intersection of the tracks. Chapman could not have looked without seeing these movements of the lantern. The very darkness rendered its light more distinct. He could not have been listening without hearing the ringing of the bells and the noise of the engines. If he neither saw the one nor heard the other, it was because he was heedless, and not taking the reckoning of the situation which his knowledge imperatively demanded of him.

The evidence furnishes little room for doubt that in his approach Chapman did not stop until he reached a point between the two tracks on the east side, the outer one on which engine 236 moved, and the next on which engine 98 approached. The space between the two tracks on the south side of Wall street was planked, used in case of two trains coming in there to transfer the baggage and passengers. If intended by Chapman to be used at the time in boarding the cars, he was familiar with its exact position. The position in which the grips he was carrying in either hand were found leaves no doubt that he stopped on this platform just before engine 236 passed. He was seen there by the engineer on 236 as his engine passed him. His very feet told him that they were pressing on the planked platform. As this platform left a space

of nine feet between the rails of the two tracks, and five or six feet between passing engines, there was ample space for him to stand safely thereon. The testimony of the engineer on 236 was that he looked down on the man as he passed, standing about midway between the tracks, with his face toward his engine. How or why he got back so as to be struck by engine 98 is but matter of speculation. It is suggested in argument that, as quite a volume of steam was being emitted by the passing engine 236, Chapman may have stepped back to get out of it, and thus went too close to the rail on which engine 98 was coming. This is but a surmise, and not a fact proven directly or indirectly. But even if it was a fact, does it help the case of the defendant in error? It would show that Chapman was taking no heed of the approaching engine, with its bell ringing, when the evidence discloses a state of facts warranting the conclusion that he had reason to know that there were two engines moving simultaneously on the two approximate tracks. If, with his knowledge of the proximity of the two tracks, he thoughtlessly stepped back merely to get out of the steam, to which he had unnecessarily exposed himself, so as to collide with engine 98, is the railroad company to answer for the result? As said by Mr. Justice Field in Little v. Hackett, 116 U. S. 371, 6 Sup. Ct. 391, 393, 29 L. Ed. 652:

"That one cannot recover damages for an injury to the commission of which he has directly contributed is a rule of established law and a principle of common justice. And it matters not whether that contribution consists in his participation in the direct cause of the injury, or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been the proximate cause of the injury, he is without remedy against one also in the wrong."

The deceased voluntarily placed himself in a known place of danger, in which he could not escape the responsibility of looking out for the approach of both engines. He could but know, had he looked when he approached that platform, that neither engine had passed over the crossing, as their headlights would have notified him of the fact. "The law recognizes the track of an operated railroad as a place of danger, of which danger a view of the track conveys notice; and, when a person goes upon such track, or so near as to be within the overhang of the cars or engine, ordinary care requires that he be alert in the use of his senses of sight and hearing to guard himself from harm. And no reliance on the exercise of care by persons in control of the movement of trains or engines will excuse any lack of the exercise of such care by persons going upon such tracks. If the use of these senses is interfered with by obstructions or by noises, ordinary, reasonable care calls for proportionately increased vigilance." Garlich v. Northern Pac. Ry. Co., 131 Fed. 839, 67 C. C. A. 237.

From his charge to the jury respecting the reciprocal duties of the railroad company and the pedestrian in the use of said crossing, it is apparent that the learned judge was impressed with the fact that the defendant in error had a very narrow margin on which to stand; and it is highly probable that an intelligent jury would have

returned a verdict for the defendant below, but for the following portion of the charge:

"So far as shown by the evidence in this case there was no eye-witness to the accident resulting in the death of the deceased; no one to tell just how it happened. In such cases the law, out of regard to the natural instinct of self-preservation, presumes that at the time of the accident the deceased was exercising due care. Under such circumstances this presumption takes the place of and serves as evidence, and it is not overthrown by the mere fact of the injury. The burden rests upon the defendant to overcome this presumption. Consequently there is a presumption that deceased looked and listened for approaching engines before venturing upon the tracks, and adopted such other precautions as an ordinarily prudent and cautious man would have adopted under like circumstances."

If this doctrine of presumption has any applicability to a death occurring at such railroad crossing, in view of the positive cautious circumspection the law imposes upon a person approaching such place of recognized danger, its call to the attention of the jury in this instance was misleading. Such presumption can only apply in the absence of any testimony explanatory of the conduct of the person at the time and the manner of his injury. The evidence in this case practically traced Chapman from the time he left his hotel for the train until the moment almost of his death. It shows that he left the hotel for the train with his grips and his overcoat, wearing a stiff hat. A man going in that direction was observed by a witness going toward the station, as also by the hack driver. No other person was found to correspond with the movements of this man. And when his body was found under the engine there were present the two grips, the stiff hat, and overcoat to identify him. He was seen by the engineer on 236 just as it passed him, and his position was then defined. It was but a few seconds thereafter when he was struck by the engine. It was, therefore, palpably misleading under such a state of the facts to tell the jury that there was no eyewitness to 'the accident, and, because there was no one to tell just how it happened, the law presumes that at the time of the accident the deceased was exercising due care, and the burden was upon the defendant to overcome such presumption, and that there was a further presumption that the deceased looked and listened for approaching engines before venturing upon the tracks, and adopted the requisite precaution.

The verdict in this case cannot be sustained on this record without, in our opinion, ignoring the responsibility which the law affixes to the negligent act of the party injured contributing directly to the accident. The request made by the plaintiff in error for a direction to the jury to return a verdict for the defendant below should have been given.

The judgment of the Circuit Court must therefore be reversed, and the cause remanded, with directions for further proceedings in conformity with this opinion.