### DELAWARE & H. R. CO. v. WILKINS.

(Circuit Court of Appeals, Second Circuit. April 30, 1907.)

#### No. 16.

1. RAILROADS—PERSONS ON TRACK—LICENSEES—CARE REQUIRED.

As against a bare licensee a railroad company may run its trains in the usual way, without special precautions, if the circumstances do not of themselves give warning of his probable presence, and he is not seen until it is too late to prevent injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, § 1236.]

2. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY—FEDERAL COURTS.

A federal court is not bound under all circumstances to submit the question of contributory negligence to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, § 299.]

3. RAILROADS—PERSONS ON TRACK—LICENSEES—DEATH—CONTRIBUTORY NEGLIGENCE.

Intestate was killed while walking as a licensee along defendant's railroad track. He was aware of the approach of the train, and stepped outside the rails to stand until it should pass him, not appreciating the fact that a curve at the point where he was standing would cause the "bucking-beam" of the engine pilot to project further than usual. He

stood· so close to the track that he was hit by the beam, though a single step back would have placed him in a position of safety. *Held*, that intestate was negligent as matter of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 1286, 1287.]

In Error to the Circuit Court of the United States for the District of New York.

This cause comes here upon writ of error to review a judgment of the Circuit Court, entered upon a verdict in favor of defendant in error, who was plaintiff below. The action was brought to recover damages for the death of plaintiff's intestate, who was killed by being struck by an engine operated by defendant on its railroad.

F. W. Maloney, F. M. Butler, and W. B. C. Stickney, for plaintiff in error.·

O. M. Barber and M. C. Webber, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. Between the railroad station at Rutland and that at Center Rutland, nearly two miles westerly, the tracks of the Rutland Railroad Company and of the Delaware & Hudson Company run substantially parallel, on the same roadbed and close to each other, the track of the Rutland lying northerly of that of the Delaware & Hudson. About a quarter mile easterly from the Center Rutland station a highway crossed both tracks at right angles. This was ·known as the "Ripley crossing." Genovesi, plaintiff's intestate, lived in a house just south of Ripley crossing, and was employed in a shop of the Vermont Marble Company, located a short distance west of Center Rutland station. Such residence and employment had continued for about six months previous to the accident. From a marble mill located south of the railroads and east of Ripley road a spur—called also the "C. & P." track—runs diagonally across the highway northwesterly till it makes a switch connection with the Delaware & Hudson track. It crosses the highway about 60 feet south of the Ripley crossing, and the switch is located 280 feet west of the same crossing. Eastward of Ripley crossing, and between it · and another crossing (known as "Chaffee crossing"), there was a signal post south of the track, intended to warn the engineer of a westbound train of the condition of the switch, with which latter it was connected by signal wires which ran to·the switch target and for a considerable distance beyond it. From the Ripley crossing to near the switch the roadbed was about on the same level with the ground on both sides, except that there were ditches on each side of the roadbed. Somewhere near the switch an embankment commenced; that is, the roadbed is raised quite a little above the land adjoining on the south side. On the north side the land is as high as the roadbed or a little higher. From the switch target to the place where the northerly of the C.· & P. rails first reaches the southerly Delaware & Hudson rail · the distance was 71 feet, and it was nearly twice as far to the place where that·C. & P. rail crossed the line of signal wires. The C. & P.

roadbed, the main roadbed, and the triangle of land bounded by those two roadbeds and the Ripley crossing were about on a level. After the accident Genovesi's body was found south of the Delaware & Hudson road, at the foot of the embankment, 35 feet from the Delaware & Hudson track and 17 feet west of the line of the switch target. From a point 825 feet east of the switch target to the target both roads (Delaware & Hudson and Rutland) run on a medium curve (a two-degree curve) towards the right or northerly. The distance between the south rail of the Delaware & Hudson and the signal wires varied from six to nine feet, and the projection of the ties beyond the south rail varied from a foot and six inches to two feet.

On the morning of November 22d at 6 :07 a west-bound passenger train of the Delaware & Hudson left the station at Rutland. It was a regular train due to leave at 6 :05 a. m. Before getting out of the yard at Rutland, it was delayed a few minutes by a long freight train of the Rutland Road, which was crossing from the freight yard on the left to the main Rutland track on the right of the Delaware & Hudson track. While waiting for the freight train to pass in front of him, the engineer of the Delaware & Hudson train extinguished the head-light on his engine. The freight train was also bound west, and, as it traveled more slowly than the Delaware & Hudson train, the latter had almost overtaken the engine of the freight train at Ripley crossing. Concededly Genovesi was struck somewhere near the switch target, and knocked off the embankment. When found, there were scratches on his face, bruises on his body, and he was lying face downward, with his neck dislocated. He was dead. The express stopped a little beyond the switch target, and the fireman came back with a lantern to find the man who had been hit.

It appeared that the track and roadbed between Chaffee crossing and Center Rutland station had been used to a considerable extent continuously for several years by the public as a short cut to mills or marble yards. That fact was known to defendant, which had endeavored by putting up signs and by scattering coarse stones along the roadbed to put a stop to it; but without success. Although the public were never invited to go upon the roadbed (except to cross it at the regular crossings)—either directly or indirectly as a convenient means of access to or from stations or waiting trains—the evidence warrants the conclusion that the persons who thus used the track for their own convenience were licensees. An examination of the Vermont cases cited on the briefs does not indicate that a railroad is held to any greater obligation of care towards licensees in that state than in other jurisdictions; the general rule being that:

"As against a bare licensee a railroad company has a right to run its train in the usual way, without special precautions, if the circumstances do not of themselves give warning of his probable presence, and he is not seen until it is too late."

Chenery v. Fitch. R. R., 160 Mass. 211, 35 N. E. 554, 22 L. R. A. 575; Keller v. Erie R. R., 183 N. Y. 67, 75 N. E. 965; Penn. R. R. v. Martin (C. C. A., Third Circuit) 111 Fed. 586, 49 C. C. A. 474, 55 L. R. A. 361; Butler v. N. Y. C. & H. R. R. (C. C. A., Second Circuit,

March 26, 1907) 152 Fed. 976; Nor. Pac. R. R. v. Jones (C. C. A., Ninth Circuit) 144 Fed. 47, 75 C. C. A. 205.

It will not be necessary, however, to discuss the law or the facts bearing upon that branch of the case. We are of the opinion that it was error to deny the motion made at the close of the case to direct a verdict in defendant's favor on the ground that, while using the defendant's track and right of way for his own convenience, plaintiff's intestate "did not exercise the care and prudence which the law requires, and was guilty of contributory negligence."

It is contended by plaintiff that in the federal courts the question of contributory negligence is always one for the jury to pass upon. This is not so. Elliott v. C., M. & St. P. R. R., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; N. P. R. R. v. Jones, 144 Fed. 47, 75 C. C. A. 205. The case at bar differs from some which are found in the Reports, where there was no eyewitness of the accident or of the movements of the deceased immediately anterior thereto, and in which the jury have been allowed to infer the facts from the appearance of the body and the conditions of the locality and of the car or engine, coupled with a presumption arising upon the "natural instinct of self-preservation." In St. Louis & S. F. R. R. v. Chapman (C. C. A., Eighth Circuit) 140 Fed. 129, 71 C. C. A. 523, it was held that the doctrine that a person is presumed to have exercised due care to protect himself from injury, if applicable at all in the case of a person who goes upon a railroad crossing at night where there is known danger from moving engines on the tracks, is only so in the absence of any testimony explanatory of his conduct at the time and of the manner of his injury. The narrative of the transactions in the case at bar is as follows:

Moriglione, a witness called for the plaintiff, who lived with Genovesi in the same house near the Ripley crossing, testified: That they were accustomed in the morning to go to work together, timing themselves by the Delaware & Hudson express, generally starting after it went by, but sometimes starting ahead of it when it was late, as it sometimes was, and that they both knew that at about 6:10 the train used to go by, and that they used to wait for it; that on the morning in question, a very dark morning, they left the house at 6:10; it being time to start for work, witness not knowing of the Delaware & Hudson express having passed. They came out of the house together, and walked down the spur (C. & P.) track towards the Delaware & Hudson track; Genovesi being in advance. As the witness drew near the Delaware & Hudson, he saw the two trains approaching, and stopped at the end of the spur track to let them go by; the freight train being in the advance. As soon as they passed, he went along the spur into and along the main track of the Delaware & Hudson, and saw a train stop and a man with a lantern come out, whereupon he stopped and looked, and saw Genovesi lying dead. The last he saw of Genovesi the latter was going towards his work, but witness seems not to have noticed him after he himself stopped to wait for the train. There is nothing remarkable in this last statement. There was no reason why the witness should have called out or urged Genovesi to stop and wait with him on the spur, because on the roadbed of the Delaware & Hudson, as has been seen, there was at least until one got some distance

beyond the switch a safe place to walk alongside of and close to the signal wires, which were from six to nine feet from the rails. No doubt Moriglione supposed that Genovesi had seen the approaching trains which he himself had noticed, and would keep away from the vicinity of the rails.

Plaintiff's witness Mecier was walking west from Chaffee crossing between the tracks of the Rutland and the Delaware & Hudson. He heard the whistle and bell of the freight train, and looked back, but, being then near the Ripley crossing, kept on until he reached it, when he got off the roadbed altogether, stepping into the triangle between the spur and the Delaware & Hudson and beyond the line of signal wire. He was about six or eight feet west of the crossing when the freight began to go by him, and, while he was standing there, the Delaware & Hudson express also passed him. He noticed the approach of the latter train a few seconds after he got off from the track. He says that, when the Delaware & Hudson passed, he stood somewhat west of the crossing, about halfway between the crossing and where the spur rail runs in; but he nowhere qualifies the statement that he was near to the crossing when he got off the tracks after seeing the freight train. Just before this witness reached the Ripley crossing he saw two men (undoubtedly Genovesi and Moriglione) start from the houses towards the C. & P. track, and proceed along the spur. Just as witness was going across the Ripley crossing, he saw one of these men go by the spur over onto the Delaware & Hudson track. He did not notice him thereafter, and the last he saw of him he was walking between the rails of the Delaware & Hudson track. Evidently he thought the position an unsafe one, because he testified it was his intention when the train went by to look ahead to see what happened. Just after the train went by him he looked and saw the man go up in the air about four feet, and then down the bank. The train was between them, and he could not see how he was struck; and did not take any notice of him after he saw him go on the track where he went until he saw him in the air.

The engineer of the express testified that, when he was a little to the east of the Ripley crossing, he saw a man come out from in front of the Rutland freight engine which was ahead of him, that the man looked up towards him and crossed over towards the witness' left, apparently crossing the Delaware & Hudson to the south to get out of the way of the train. He was a considerable distance ahead, amply sufficient to clear the tracks. The engineer was sitting on the right-hand side of the cab, so the man soon passed out of his range of vision, and he supposed he had reached a place of safety until he heard the fireman, who was lookout on the left-hand side, call out, "We struck a man," whereupon he came to a stop as soon as he could, using "emergency" brake. The engineer estimated that the man he saw coming out from in front of the Rutland freight was somewhere near the switch target. If this estimate is correct, the man the engineer saw crossing to southward was undoubtedly Genovesi, who had (since Mecier saw him) got over as far as the Rutland track. Plaintiff's counsel contends that the engineer is mistaken in his estimate, and that the man he saw was really Mecier. We are not inclined to this

conclusion, because Mecier got off the tracks close to the crossing, although he subsequently moved further west into the triangle; and it seems singular that the engineer should be so far out of his way in estimating distance. The switch-target is 280 feet from the crossing. But really it makes little difference if it was Mecier whom he saw. The only result would be a finding that Genovesi had not at any time that morning got north of the track between the rails of the Delaware & Hudson where Mecier saw him walking.

The fireman testified that he was sitting on the left-hand side of the cab; that it was not daylight and it was not dark, and that he could see the track 200 or 300 feet ahead (the train was running on a curve to the right), and could see a man at that distance if one were there; that, while thus looking out and when they had got on the west side of the Ripley crossing, he saw a man step outside of the rail not a great way ahead, looking at the train; that he stepped over in front of the left side as they went west, and stood right outside the end of the ties with his face towards the train, and that witness supposed he was out far enough to clear the track. He did not undertake to estimate the man's distance ahead when he thus saw him, but estimates that there could not over four or five seconds have elapsed when he was struck by the bucking-beam of the engine and knocked down the embankment. This is the heavy timber covered with iron plate, which is located cross-wise across the front of the engine above the cowcatcher, and projects on each side about as far as the ends of the ties. When rounding a curve, the sharper the curve the more the bucking-beam projects out. It might be from four to six inches more than usual. The fireman called out, as stated before, the train was stopped, and he went back with a lantern, and, with others, found the body.

Plaintiff's counsel contends that the fireman's testimony is not entitled to consideration. He was cross-examined at great length as to what details of dress and personal appearance he noticed in the man he saw. Like many other inexperienced witnesses, he thereupon became voluble as to a number of wholly irrelevant details, irrelevant because no one disputes the proposition that the man whom the engine struck was Genovesi. We find nothing to impeach the witness, and no contradiction of his story on any material points. Moreover, it fits in with the other testimony and is corroborated by the testimony of the doctor called by plaintiff as to the condition of Genovesi's body. Evidently his neck was broken by the fall. There were contusions on the right shoulder and right hip, more swollen on the hip than on the shoulder. The bucking-beam would be about at the height of his hip. Whether there is some projection higher up on the engine does not appear. There can be no escape from the conclusion that these contusions mark the place where the blow was delivered which hurled him off the bank. If he had been overtaken while walking, unconscious of danger, between the rails, as Mecier saw him, these marks would have been on his back. If he were crossing the track trying to get out of the way to the southward onto the safe part of the roadbed near the signal wires, the marks would have been on the left side. Being on the right side, they furnish the strongest cor-

roboration of the story of the fireman as to where Genovesi was standing when he was struck. But, even if the evidence of the fireman were thrown out of the case, and the evidence of the engineer confined, as plaintiff contends it should be, to Mecier's movements, then we have Genovesi, familiar with the locality and aware that a train was due, failing to keep himself on the part of the roadbed where he could stand or walk with safety, but going, instead, unnecessarily so close to the track as to expose himself to being hit by passing trains when a single step would have put him out of danger.

There can be no doubt, however, that, aware of the approach of the train, he stepped outside the rails to stand till it might pass him, and, not appreciating the fact that a curve would cause the bucking-beam to project further than usual, stood so close to the track that he was hit, instead of stepping back, as he might have done, to the signal wires, or even over them and a bit down the slope.

Within the principles laid down in St. Louis & S. F. R. R. v. Chapman and Elliott v. C., M. & St. P. R. R., supra, the jury should have been instructed to find for the defendant.

Judgment reversed, and cause remanded for a new trial.