SPRINGER v. ST. LOUIS SOUTHWESTERN RY. CO.

(Circuit Court of Appeals, Eighth Circuit.    April 4, 1908.)

No. 2,680.

**1. RAILROADS—INJURY TO PERSONS ON TRACK—ARKANSAS STATUTE.**

Kirby's Dig. Ark. § 6607, providing that "it is the duty of all persons running trains in this state upon any railroad to keep a constant lookout for persons and property upon the tracks," which is construed by the Supreme Court of the state to apply to the running of trains in railroad yards, only requires that the trainmen shall keep a lookout ahead on moving trains, and, where such lookout is properly kept, does not, without more, render a company liable for the death of a person killed in railroad yards who was not seen.

**2. SAME—PERSON KILLED IN SWITCHYARD DURING FIRE—CONTRIBUTORY NEGLIGENCE.**

A fire started in the daytime in a residence addition of Pine Bluff, Ark., destroying about 100 houses.   In endeavoring to save their household goods the residents carried them onto the tracks of the railroad immediately south of the burning district.   These tracks were in the switchyards of the company, without any streets or private crossings thereon.   During a period of about 45 minutes of the fire the railroad company had run its cars off of the first tracks next to the fire, when the employés, discovering that some oil tanks on the remaining cars were beginning to smoke from the heat of the fire and were in danger of explosion and augmenting the danger of the situation, ran an engine to the end of the cars to push them out.   There was an opening in this line of cars of four or five feet, not left under conditions to indicate an invitation to the people to use it as a passway for carrying goods.   Just before this movement of the train a switchman went to this opening and adjusted the drawheads for the connection, and gave warning to the people thronging about the place of the intended movement, and then passed down the train to warn persons who were passing over and beneath the drawheads.   The deceased, who worked in a mill shop outside of the addition, left his post and went to the fire, and was assisting in carrying a mattress through said opening.   He was warned by a third person of the danger just before the accident, and the bell on the engine passing down the open tracks to the rear of these cars was ringing, and continued to ring as the movement of the cars begun.   The engineer and his fireman kept a lookout as the movement of the train began, but did not observe the defendant.   *Held,* that to the deceased, who was a mere volunteer on its right of way, the company owed no other duty than not to wantonly or recklessly injure him, and his failure to stop, look, or listen directly contributed to his death, and a verdict for the defendant below was properly directed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, § 891.]

Adams, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

Charles T. Coleman (Samuel M. Taylor, William D. Jones, George W. Murphy, and William M. Lewis, on the brief), for plaintiff in error.

Nicholas J. Gantt, Jr. (Samuel H. West, Frank G. Bridges, and William T. Wooldridge, on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an action by the administratrix of John I. Springer to recover damages for personal injury to him, resulting in his death, alleged to have been occasioned by the negligence of the defendant railway company. About 2 o'clock p. m. February 13, 1907, a fire broke out in an addition to the city of Pine Bluff, Ark. It was of such character as to destroy nearly 100 houses and drive the inhabitants into the streets and southward onto the railroad tracks of the ·defendant. Immediately on the south side of this addition, extending along three blocks, were the switchyards of the defendant, running east and west. There was a network of perhaps 12 tracks used exclusively by the railroad for storing and switching its cars. There were no street or road crossings over said tracks. The fire originated in a lot in the westernmost block, bordering on the western end of the switchyard. The fire spread eastward and northeast.

While the evidence tended to show that there were some facilities for the people to pass out to the west, and to the northeast to the ground, known as the "shop property," where the railroad and other shops were located, the readiest mode of escape for the people from the fire area and to carry out their household goods and effects was onto and over the said railroad tracks. Naturally enough, there was intense excitement among the people, hurrying and struggling to save their exposed personal property, which they undertook to accomplish by carrying and tumbling the household goods wherever they could find a place between the net work of railroad tracks. When the fire began to extend eastward, there were cars of various kinds on the tracks next to the lots where the fire raged. Within the first 45 minutes of the fire the danger to the cars became apparent, and the employés of the company had removed from the west to the east the cars off of the first five northernmost tracks. On the sixth track there then stood a train of freight cars, at one point in which the cars were broken, with a space between them of four or five feet. Some of the people, in carrying their household effects to the south, would climb through this train over the drawheads, and others began to pass through the said narrow passageway where the cars stood apart. About this time the yard master or foreman discovered that the oil tanks on the cars to the west side of said cut off were becoming so hot from the heat of the fire they began to smoke. To save the company's property, as well as to prevent a not improbable explosion, augmenting the impending danger to property and the lives of people within its range, the superintendent gave direction to the crew to move said train to the east out of danger. To effect this the engine was carried to the west end of the train, facing east, to push it eastward.

Springer did not live in said addition, and had no property interests there to look after. The plaintiff's witness Frazier was indulged to testify that Mr. Peck, division superintendent of the defendant, told him:

"That he had had the shops closed down and ordered the men to come down and help save the stuff. He told me to keep them as long as they could do any good. The shopmen were at the fire. They carried my goods out of the

house; but the goods were burned up in the street. Most of the goods were carried over, then, in the railroad yards."

To say nothing of this being mere hearsay testimony, there is nothing in the record to show that Springer was in the employ of the defendant. The only testimony touching this matter is that of the widow of the deceased, who said:

"He [Springer] was employed by the Cotton Belt Railway Company as a scratch boss in the mill; that is, he marked the timber to be dressed."

His immediate foreman, Wheelan, testified:

"I was foreman in the mill department of the shops, and Springer worked under me. The men were not ordered to quit work and go to the fire. They kept dropping out and going. Springer was familiar with the yards. I do not know that Springer had gone to the fire. I went to the fire after all the men had gone. I did not tell them not to go."

After he reached the vicinity of the fire, witness Peebles testified that he (Peebles) had been carrying goods out of a house, and, when he went out to the railroad tracks and discovered that some goods were taking fire, he saw Springer and said to him, "Let's try to save some of the stuff;" that they carried a dresser through said opening, then returned and picked up a mattress, and while Springer was attempting to pass through the opening with it he was caught and crushed between the cars.

The negligent liability of the defendant railroad for this accident is charged in two counts of the petition. The substance of the first count is that, while the people and Springer were fleeing with portions of their goods across said tracks, "the defendant, without exercising ordinary care and caution, and without keeping a constant lookout for persons upon its tracks, negligently, recklessly, and wantonly, by its agents and employés, with a locomotive steam engine pushed certain cars then and there standing on its said tracks, which said Springer and others were passing, causing them with great force to come together, catching said deceased," etc. The second count, after setting out the preliminary facts, charges that:

"The defendant, without exercising ordinary care and caution, and without keeping a constant lookout for persons upon its tracks, negligently, recklessly, and wantonly, by its agents and employés, with a locomotive steam engine, negligently, wantonly, and violently pushed certain cars then and there standing on its tracks, and which cars were at the time about four or five feet apart, and between which said John I. Springer and others wree passing, causing them with great force to come together, catching said deceased."

The answer, after setting out the facts occasioning the movement of said cars, alleged contributory negligence of the deceased. At the conclusion of the evidence the court directed a verdict for the defendant.

Much reliance is placed by plaintiff's counsel upon the following statute of Arkansas (Kirby's Dig. § 6607):

"It is the duty of all persons running trains in this state upon any railroad to keep a constant lookout for persons and property upon the tracks of any and all railroads, and if any persons or property shall be killed or injured by the neglect of any employés of any railroad to keep such lookout, the company owning and operating any such railroad shall be liable and re-

sponsible to the person injured for all damages resulting from the neglect to keep such lookout, and the burden of proof shall devolve upon such railroad to establish the fact that this duty has been performed."

It is held by the Supreme Court of that state that this statute applies as well to the running of trains in railroad yards as elsewhere. Railway v. McQueeney, 78 Ark. 28, 92 S. W. 1120; Railway v. Graham, 102 S. W. 700. On its face this statute only creates the liability of a railroad when the injury or death results from neglect, which consists in failing to keep a constant lookout for persons upon its track. Like any other act of negligence, which is always a relative term, the degree of vigilance is measured by the surrounding circumstances.

The chief insistence of plaintiff's counsel is that under the special circumstances, when the employés in charge of the movement of the engine and cars knew that a multitude of people were thronging about the track on which the movement was proposed to be made, it was a wanton act to undertake it without taking such affirmative measures of precaution as would certainly have assured them that no person would be on the track. This extreme proposition cannot rest alone upon the terms of said statute. The only requirement it imposes is that the persons running the train should "keep a constant lookout for persons upon the track." Applied in a practical way, the lawmakers evidently had in mind the probability that persons, whether rightfully or wrongfully, might get upon railroad tracks, and therefore, out of consideration for their lives and limbs, they required those running trains to keep a constant lookout for such possibilities, and thereby avoid, as near as might be, injuring them. When, however, the conductor, engineer, and fireman, while the train is running, keep such lookout, they discharge the duty imposed by this statute, and no liability would attach to the railroad for striking and injuring the person upon its track in so far as the statute itself is concerned. This, it seems to us, must be conceded.

In this respect the testimony of the engineer and the fireman in charge of the engine was that from their respective sides of the cab each kept a sharp lookout ahead, and they had no knowledge that the plaintiff had gone between the cars, although they knew that many people were about the train and had been passing through the same. It therefore devolved upon the plaintiff to show something more to inculpate the defendant company. On the cross-examination of the engineer (Dillon) he was indulged to state what he said to the switchman who gave him the order to move the train, which was to the effect that it was dangerous, as they were liable to kill somebody, and that he was loath to make the movement. It was inadmissible to bind the defendant by this free expression of opinion by the engineer. Being admitted, it evidenced only the sense of the danger of moving the cars at the time and place, and the necessity in executing the order of exercising due care.

The law has equal regard for the rights of the railroad company, and its conduct in the matter of precaution must be compared with that of Springer's. The right of self-preservation and protection in the eye of the law is accorded to the corporate entity, which but

represents the aggregate stockholders, as well as to the individual. The cars stood upon a track dedicated to the exclusive use of the railroad company. There was no public highway over this ground, and the public had no right to appropriate it to a private use. When the property of the railroad company became exposed to imminent danger of destruction, from the proximity of the fire, it had the unquestioned right to the immediate use of its track, in its private yards, for the extrication of its cars. The emergency admitted of no delay. When the yard master or overseer discovered that the oil tanks were beginning to smoke from the heat of the fire, a delay of a few minutes might have been attended with disastrous results, not only to the cars of the railroad, but to the lives of hundreds of people and their goods thronging and scattered close to the cars. The lack of energetic and prompt action on the part of the employés to rescue the cars might have rendered the company liable for other and greater damages.

Under such conditions, what duty did the law impose upon the railroad toward the man Springer, before it could move its own property on and over its own right of way? He was not on the defendant's track and right of way by authority, or even as a licensee from the defendant. The employés had not seen him, and did not know that he was there, or that he contemplated passing between the cars. As a general precaution, taken by the railroad, the evidence shows the fallowing facts: Woody, a switchman, who worked in the field, testified:

"Before the engine came to the cars, I was getting people out of the way from the engine and cars. I saw a lot of people jumping through the cars over the drawbars, and I wanted to keep any more from going through. The engine coupled on and no more people were jumping through the cars. I hollered to the people to stand back, so that I could see down the line we were shoving, and a lot of people got back. I gave the signal to the engineer to come ahead. I saw there was an opening down there about five feet in the cars, and I went down that way to catch the coupling; but before I got there the cars came together, and somebody said a man was killed, and I gave the signal to stop. * * * Another switchman, Robert Searles, was between me and the engine. We hollered to the people at the time to get out of the way, and they all stood back. I did not see a man between the cars. We were acting under the foreman's orders to move the cars to keep them from burning."

He further states that they did not see anybody carrying goods through the opening, but the people he was hallooing at were going over the drawheads; but he saw others stopping people from going through the opening. Both citizens and employés were assisting him in keeping the people back. "I hollered to the people in a high pitch."

McKay, another switchman, testified that:

"Just prior to the accident I walked to the car where he [Springer] went through and opened the knuckle and then walked about two car lengths to the east. I saw the engine coming, and wanted to get on the other side. So I went through on the north side, and there was quite a number of fellows running back and forth through there. I said: 'You had better look out; there is an engine coming against that car.' As I said this I met another bunch and said the same thing, and I walked east about two car lengths on the north side of the car."

The other switchman, Searles, testified as follows:

"We coupled to the west string and I was told to wait until the other switchman walked up to the opening. I was midway to the first car and the engine. Woody was the other switchman. We waited for him to go to the opening. He gave me the signal to move ahead, and I gave it to the engineer."

There was no contradiction of this evidence. In addition to this, the bell on the engine, as it was moving on to the west end of the train, was ringing and continued to ring as the movement of the cars began. Several witnesses, outside of the employés, heard the bell and took notice. But, says counsel for the plaintiff, the switchman should have stood at the small opening and continued to cry out for the benefit of Springer, as if he was then blind and deaf, and the railroad company owed him some especial duty. As people had been climbing through the cars throughout the length of the train, the switchmen had also to see to that incident. As the people in the vicinity took heed of his warning and gave way, he had the right to assume that their attention would be given to the movement of the cars, while he went along the line to keep other people from attempting to pass through over the drawheads.

If, however, it should be conceded that under such state of facts a jury might be permitted to say that the company fell short of the full measure of its duty toward Springer, what can be said in extenuation of his conduct? Did he even approximate the performance of the duty the law laid upon him? If he had home, or family, or property involved in that conflagration, from a sentimental viewpoint his conduct might invite some considerate indulgence. The law is not builded on sentiment or emotion. It deals with the practical relations of men as members of the social compact—with checks and mutual obligations, which experience has crystallized into generally recognized custom, or has taken the form of positive statute. Springer had no business to take him upon the defendant's right of way. He had gone to the vicinity of the fire from impulse, if not curiosity. It is a reasonable inference that, as the mattress which Peebles and Springer were carrying was between them, Springer went in between the cars without stopping or looking or paying any heed to anything else than the mattress, as it fell to the north side of the cars.

· What were the open, visible facts about that yard just preceding this accident? Within the preceding 45 minutes of the raging of the fire the railroad men had been running an engine up and down until they had cleared five of the tracks. The plaintiff's witness Schnable, testified that:

"The company was switching with a couple of engines up and down those tracks, and paid no attention to the people trying to save their goods. * * * Cars and switch engines were moving on the tracks. In their excitement, people did not realize their danger. * * * Switching was done on the track 'south of the main line."

If this is so, the "switching with a couple of engines up and down these tracks" was additional warning to Springer that it indicated a movement of the train, which was exposed after the train north of it had been pulled away, at any moment. The presumption was that

there could be no other purpose in running an engine over the cleared tracks than to pull out this train. Several witnesses testified to seeing the engine, and hearing its bell, that hitched to the train on track 6, and heeded the warning. The fact that no other person than Springer was injured but accentuates his heedlessness.

Within that time Springer had learned of the fire while in his shop to the east of the town. Judging from the diagram in the record, the distance of that shop from where the accident occurred was about four blocks. It is incredible that Springer should not have observed the preceding movement of the engine and the cars. More than that, just before the engine moved to push the train of cars in question, the brakeman passed through this opening to adjust the knuckle, which was an act to indicate preparation for movement. The switchman gave the warning, which the people in the vicinity heard and stepped backward. If Springer did not see or hear these things, the further evidence is that the engine was moving at the west end of the train, with the bell ringing, which continued during the movement of the cars. Other people heard this signal and saw the engine in motion, which was in full view and only a short distance away. More significant still of his recklessness, the witness Barbler testified:

"I knew Mr Springer, and saw him just before he was killed. He was carrying furniture away from the fire. We were right near the opening between the cars on track 5. We had hold of a mattress and carried it up to the opening, and told him it was dangerous to go through, and he dropped it and went on and got something else. I went away and didn't see him any more. This was eight or ten minutes before the accident."

We discover no evidence of internal improbability of the truth of this statement, nor any external facts which a disingenuous and disinterested mind should regard as casting any reasonable doubt on its veracity. The imputed conflict between his statement and that of Peebles is rather seeming than real. The expression, "We had hold of a mattress, and carried it up there to an opening, and told him it was dangerous to go through, and he dropped it and went on and got something else," does not conflict with Peebles' statement, as Springer, before Peebles spoke to him, may have been engaged in like work.

Realizing the force of all this evidence, counsel for the plaintiff suggests that, in the absence of direct proof to the contrary, the presumption should be indulged that Springer heeded the warning and did listen and look before attempting to pass through the cars. There are two complete answers to this:

(1) The witness Bobbitt testified, without contradiction:

"I had been leaning against one of the cars just before the accident. I saw the engine coming and moved away. I saw Springer go between the cars, carrying some household goods. He was going straight ahead looking south without looking east or west. If he had looked, he could have seen the engine coming. There was nothing to obstruct his view."

He did not see Springer hurt, or notice some women near the opening. We do not perceive any ground for discrediting his statement, simply because he did not see and identify a lot of other people who chanced to be in that throng.

(2) The law declares that, under the surrounding conditions, Springer did not look and listen, or that he did not heed the warnings, as he could not have listened without hearing the bell, and he could not have looked without seeing the engine moving, as it was in full view, only a short distance away. Northern Pac. R. Co. v. Freeman, 174 U. S. 380, 384, loc. cit., 19 Sup. Ct. 763, 43 L. Ed. 1014; Hayden v. M., K. & T. Ry. Co., 124 Mo. 573, loc. cit., 28 S. W. 74; Railway Co. v. Andrews, 130 Fed. 67–71, 64 C. C. A. 399; Rollins v. Railway Co., 139 Fed. 639, 71 C. C. A. 615; Railroad Co. v. Chapman, 140 Fed. 129, 71 C. C. A. 523; Rich v. Railway Co., 149 Fed. 79, 78 C. C. A. 663.

In Pittsburg, etc., R. Co. v. West, 34 Ind. App. 95, 69 N. E. 1017, the court said:

"The presumption arises that a traveler approaching and about to cross the railroad track saw whatever was in the range of his vision had he looked, or heard whatever he might have heard had he listened."

There is nothing in the Arkansas statute, hereinbefore quoted, which in any degree exempted Springer from the consequences of his own heedlessness, without which the accident would not have happened. The Supreme Court of Arkansas has repeatedly and persistently said that the rule of application to any person when entering upon the tracks of the railroad company to keep a lookout for his own safety is too deeply rooted to tolerate debate. "The true rule, which no amount of amplification can simplify, is that, whenever the negligence of the plaintiff contributes proximately to cause the injury of which he complains, the defendant is not liable." Johnson v. Stewart, 62 Ark. 164–170, 34 S. W. 889; Railway Company v. Leathers, 62 Ark. 235, 35 S. W. 216; Railway Company v. Dingman, 62 Ark. 245, 35 S. W. 219; Burns v. Railway Co., 76 Ark. 10, 88 S. W. 824; Barry v. Railway Company, 77 Ark. 401, 91 S. W. 748. See, also, Adams v. Railway Co., 83 Ark. 300, 103 S. W. 725. This principle has been so repeatedly applied to cases in pari materia in this jurisdiction that to reverse this case would tend to unsettle the rule. Mo. Pac. Ry. Co. v. Moseley, 57 Fed. 921, 6 C. C. A. 641; Crookston Lumber Co. v. Boutin, 149 Fed. 680, 79 C. C. A. 368; Davis v. C., R. I. & P. Ry. Co., 159 Fed. 10, decided at the September term, 1907. This rule is aptly stated in Carlson v. Railway, 96 Minn. 504, 105 N. W. 555, 4 L. R. A. (N. S.) 349, 113 Am. St. Rep. 655, as follows:

"The duty of exercising caution in attempting to cross a railway track, a place of known danger, is not relaxed by the opportunity or occasion for theorizing or difference of opinion as to whether a train is or is not likely to pass. Observation, not logic, is the proper precaution." Guhl v. Whitcomb, 109 Wis. 69–85, 85 N. W. 142, 83 Am. St. Rep. 889.

Some reliance is placed by counsel for plaintiff upon the case of Railway v. Cain (Ark.) 104 S. W. 533. Persons were passing in front of cars standing on the side tracks, when other cars were "shunted" against the standing cars, which sent them forward so as to injure the plaintiff. Because of the fact that there was evidence to show that the brakeman at or near the end of the moving cars saw the

plaintiff and his companions as they were about to cross the track behind the standing cars, and observed their movements, it was held that the case should go to the jury. Especially so, when the testimony tended to show that the brakeman, after he had observed the parties going upon the track, by calling their attention to the moving cars, could have warned the plaintiff of the danger. The court said:

"The most serious question is whether the jury were warranted in finding that the brakeman knew or had reason to know that the plaintiff did not see the moving cars, and was, therefore, oblivious of his peril; for, unless the brakeman discovered the fact that the plaintiff was oblivious of the danger, he had the right to act upon the assumption that the latter would not expose himself to it by going upon the track. It is not a question whether the brakemen could have discovered the plaintiff's peril in time to have avoided it, but whether he did discover it."

The case is rather authority for the proposition that, if the party was injured where he had no right to be, there was no responsibility for the accident on the part of the railroad company, unless it discovered his peril in time to have avoided the injury. Under the facts and circumstances of the case at bar, we have no need to controvert the ruling of courts respecting the responsibility of railroad companies for injuring persons under conditions where the conduct of the employés amounts to an implied invitation to persons to undertake to pass over crossings where the cars stand separated, without exercising a proper degree of care when suddenly closing up the space. It will be found, on careful analysis of the cases, that the responsibility of the railroad company is conditioned, "unless he [the injured person] contributed to it by his own negligence," or some equivalent expression.

The narrowness of the space, four or five feet, between the cars, where the injury in question occurred, indicates that it was not intended as a passway for carrying through it furniture and household goods; otherwise, it would have been left wider. Clearly, it was made before the fire originated, as the engine did not come to track 6 until after the cars were removed from the first five tracks. As it was not a public crossing, where the public had a right to cross, and, therefore, might reasonably assume that the railroad left the opening for public accommodation, and inasmuch as the small opening was there prior to the fire, it cannot even plausibly be asserted that the railroad company should be held to have apparently invited the public to use it. Springer had no right to be where he was injured. He was uninvited by the railroad to be there. Under extreme exigency the railroad was using its own track in its private yards to save its own property from imminent peril. Under such conditions it owed such an intruder as Springer no other obligation than not to wantonly run him down. The effort made by the employés to see that the track was cleared, together with the open movement of the engine and the ringing of the bell, contradict any imputation of recklessness or wantonness on the part of the defendant.

The trial judge saw and heard all the witnesses. He was familiar with the physical facts of the place. His judgment on the undisputed facts, in our opinion, should be affirmed. It is so ordered.

ADAMS, Circuit Judge (dissenting). I am unable to agree with the majority in this case. I think the evidence clearly warranted submission to the jury of the issues here involved. The evidence, including the failure to observe the requirements of the laws of Arkansas, strongly tends to show negligence on the part of the company in moving its train of cars which killed decedent. At that time the citizens of Pine Bluff, including men, women, and children, were desperately struggling to save their household goods from conflagration by carrying them southward across the railroad tracks to a place of safety. No other direction was available to them. A train of freight cars which obstructed their flight had been opened, making a passageway of four or five feet in width, through which they had for 45 minutes been permitted to pass and repass. From 1,000 to 1,500 excited persons were making or liable at any time to make use of the passageway. The situation was such that the engineer in charge of the switch engine, when ordered to couple on and move the train eastward, thereby closing up the gap or passageway, at first refused to do it. He testified thus:

"When the switchman ordered me to go on that track, I told him that it wouldn't do; that we would kill somebody if we did, or were liable to do so. I didn't want to move that car; but he ordered me to, and it was my duty to obey. * * * I knew that the whole space in there was filled with people and that they were passing to and fro. I knew that they were carrying things there and putting them down; but he signaled me on, and I had to go."

While decedent had no property exposed to the peril of the fire which required moving, he was engaged in assisting others who had. He was not a trespasser. Not only does the evidence tend to show, but I think it conclusively shows, that he was rendering assistance by direction of defendant's agents. He was employed in the defendant's shops nearby, and with many other workmen was out doing what he could to aid the distressed citizens of the place. James Frazier, the chief of the fire department, testified that Mr. E. A. Peck, the division superintendent of defendant, was there, and that he told him that "he had had the shops closed down, and ordered the men to come down and help save the stuff." He also testified that the superintendent told him "to keep them as long as they could do any good." Mr. Peck fails to deny this testimony. While Mr. Wheelan, the foreman of the shops testified in his direct examination as stated in the opinion of the majority, he testified on cross-examination as follows:

"I went to the fire after all the men had gone. They did not come back that evening. The majority of them lived in the burnt district, and I suppose they went to help. We did not dock any of them for the time lost."

Not only was decedent aiding the stricken people by consent of his employer, but there is ample evidence tending to show that he and all others were by like consent of the company passing over the railroad tracks and between the cars in question in the performance of their work. They had, with the full knowledge and consent of the company, been doing it for 45 minutes before Springer was killed, and not only had no objection been made by any of the officers or agents of the company, but they had facilitated the use of the

tracks and passageway by the people. The defendant generously and commendably acceded to the exigent demand of the occasion. It allowed or licensed the use of its track and passageway between the cars by the people. It does not take the time required to bar rights by the statute of limitations to establish a license. It may be established in a short time for a particular and temporary purpose, and in my opinion it was so done in this case. Springer was obeying the command of the defendant in doing what he did at the time he was killed, and he and others engaged with him were crossing over the tracks and making use of the passageway in question by the license and invitation of the defendant. While Springer and the others were responding to that invitation, the law required the exercise on defendant's part of ordinary care and prudence for their safety. Bennett v. Railroad Co., 102 U. S. 577, 26 L. Ed. 235; Foster v. Portland Gold Min. Co.. 52 C. C. A. 393, 114 Fed. 613; Carleton v. Franconia Iron & Steel Co., 99 Mass. 216.

Importance seems to be given by the majority to the fact that there were some oil tanks on cars in the yard which were liable to be ignited, and therefore required hasty removal. There is evidence that the oil tanks were in no danger, and also evidence that they were in danger of ignition; but, assuming the fact to be that they were in danger, that fact affords no reason for departure from the general rule governing the conduct of the defendant towards others situated like Springer. It could not disregard its duty to them to save its own property. Both required consideration and attention. The exposure of the oil tanks and all the other facts as they existed were entitled to consideration in determining whether under all the circumstances the defendant exercised ordinary care. The more complicated and complex the facts, the more reason is there for submitting them to the consideration of a jury, whose appropriate function is to weigh and determine them. While I think it conclusively appears that Springer was killed by the negligent act of the defendant company—that is, by failure to exercise ordinary care for his safety— I cannot be mistaken in saying that there was substantial evidence tending to show that its negligence caused his death. This is all that is necessary to require a submission of the issue of negligence to the jury.

This brings me now to a consideration of the issue of contributory negligence upon which the majority rely for affirmance. Before considering this it is well to take our bearings in the law. Contributory negligence is a defense which the defendant is required to plead and prove. It is properly defined to be a failure to exercise ordinary care for one's own safety, and by "ordinary care" is meant that kind of care which ordinarily prudent persons usually exercise in similar circumstances. The defendant, therefore, had the burden in this case of showing that at the time Springer was killed he failed to exercise that care for his own safety which ordinarily prudent persons generally do in circumstances like those in which he was placed at the time. The rule is well established, too, that the defense of contributory negligence must be made out by proof that would satisfy all reasonable men in the exercise of a fair and honest judgment, before the

court can take the issue from the jury and say as a matter of law that the defense has been sustained and direct a verdict for the defendant accordingly. Now, how about the facts in this case? Do they show so conclusively that all reasonable men in the exercise of fair and honest judgment would say so that Springer was not at the time he was injured exercising the care and prudence for his own safety which ordinarily prudent persons usually do in like circumstances? That is the question. If it is answered in the affirmative, the case should have been taken from the jury, as it was. If it is answered in the negative, the issue should have been submitted to the jury for its exclusive determination.

What are the facts? Everybody was excited. From 1,000 to 1,500 anxious people were straining every nerve to save their own and their neighbors' property from the conflagration raging close by. As one witness put it:

"Everybody was excited, and the people running around the tracks did not know how much danger they encountered. There was no other way of escape. * * * If they went north, there was the river. If they went west, they had to go through the fire. South and east were the yards and shops."

Another witness said:

"There must have been 1,000 or 1,200 people crossing and recrossing those tracks. They were scattered everywhere—all over the yard and tracks where they were carrying goods. Others were passing and repassing through the opening, carrying goods through. There were men, women, and children."

Another said:

"The tracks were covered with people running to and fro, trying to save their things. The only way to save them was across the railroad tracks."

In this condition of intense excitement, confusion, and distraction, Springer had already carried one load of goods through the passageway, deposited it in a place of safety, returned for a second load, and was carrying that along the way and between the cars, which he had already once found perfectly safe. When he approached the opening there was no person there to warn him that the gap was to be closed. He possibly might have said to himself that the defendant would perform its statutory duty and provide a lookout if it was about to move its train, especially in circumstances of such peril to many as then surrounded the situation. It may be conceded that witness McKay, a part only of whose testimony is found in the majority opinion, had been there a short time before. He said:

"There was quite a number of fellows running back and forth through there."

He also said:

"You had better look out. There is an engine coming against that car."

But this is not all his evidence. He further said:

"I spoke to them in a pretty good voice, just a little louder than I am now using on the witness stand. I walked right through there, and kept walking. I did not stop long enough to see whether those who were coming and going with furniture heard me or not."

He not only testified that he walked east about two car lengths on the north side of the car, but he added:

"Then everybody said there was a man killed."

This testimony, in my opinion, falls far short of showing conclusively, or even persuasively, that McKay gave Springer notice of the intended movement of the train of cars. All it necessarily means is that he (McKay) passed along in the midst of the prevailing noise and confusion, and in a tone of voice not much louder than a witness employs in a quiet courtroom made his announcement. But where was Springer then? McKay walked the distance of two car lengths before the commotion naturally incident to so grave a matter as taking the life of a human being broke out. We may reasonably infer from this that, as Springer with his heavy load of household goods upon him would not be likely to walk faster than McKay who was without any burden, the former was at least two car lengths away from the opening when McKay in a moderate tone of voice made his announcement. We may also reasonably enough assume that, in the midst of the crowd of people and the inevitable noise and confusion, Springer could not have seen McKay or heard his announcement, even if he had been nearer than two car lengths from the opening. I do not think any one can fairly read the testimony of McKay without concluding that it is a matter of conjecture, pure and simple, whether, under the circumstances surrounding him at the time, Springer did in fact see or hear McKay, or whether he in the exercise of ordinary care could have seen or heard him.

But it is said that Woody, the field switchman, gave some notice which Springer negligently failed to heed. He was the one who gave the signal to the engineer to come ahead. Some of his evidence is quoted in the opinion, but not all. He testified on cross-examination that he "did not see anybody carrying goods through the opening, that he did not warn anybody at that particular opening, that he could not see people going through the gap because people were between him and the gap, and that he had to look over their heads to see that there was a gap." He also testified on cross-examination that the persons he "was hollowing at were going over the drawheads" at other places than between the cars at the opening. The facts to which I have just called attention, as well as the many reasonable inferences to be drawn from the attending facts and circumstances, take away from the evidence of witness Woody that conclusiveness requisite to declare its legal effect. He, like McKay, utterly fails to make certain, or even probable, the fact that Springer either heard, or in the exercise of ordinary care ought to have heard, any warnings given for the movement of the train.

There was evidence tending to show that a bell was ringing on the switch engine as it approached the west side of the train of cars, but that evidence was discredited by the proof that there were two switch engines carrying bells, and that the sound might have emanated from the other engine. It is also not unfair to assume that the noise and confusion would prevent Springer from hearing the bell or appreciating its meaning, inasmuch as the engine moving the train, even

if the bell was on it, was a good many car lengths away from the gap.. Witness Bobbitt is also relied upon as giving testimony which justi-- fied the peremptory instruction in favor of the defendant. He tes- tified that:

"He saw Springer go between the cars carrying some household goods. He was going straight ahead, looking south, without looking east or west. If he had looked, he could have seen the engine coming."

When his testimony is critically examined, as it ought to be in a case of this kind, all he really states is that just as Springer was en- tering the gap he was looking south, and did not look east or west. Non constat he might a moment before only have given the requisite attention. Union Pacific R. Co. v. Rosewater (C. C. A.) 157 Fed. 168. Moreover, this witness is discredited by his failure to observe other things which undoubtedly occurred.

Other evidence found in the record is relied upon, and particular- ly that of two women, who stated that they saw the engine approach the west end of the train, and in their opinion Springer might have seen it if he had looked.

The foregoing is substantially all the evidence upon which we are asked to justify a peremptory instruction given to the jury below on the ground of Springer's contributory negligence. If, in fact, it is. not all of the evidence on that subject, it fairly represents in its un- certainty and inaccuracy the body of the evidence relied upon for that purpose. I am unable to find in it that certainty requisite for a direc- tion as a matter of law that Springer failed to exercise ordinary care for his own safety. In actions of exigency, of high state of excite- ment, of confusion and noise, people do not ordinarily act with the same coolness, deliberation, and foresight as they exhibit on occa- sions when conditions favor calm and deliberate mental processes. This most natural. human infirmity ought to be, and has been, recog- nized judicially in the determination of questions of ordinary care. Mr. Justice Holmes, when one of the judges of the Supreme Judicial. Court of Massachusetts, in the case of Pomeroy v. Westfield, 154 Mass. 462, 465, 28 N. E. 899, on this subject said as follows:

"But, further, in determining the right of a plaintiff to recover, there are two elements to be considered: First, how far he is chargeable with knowl- edge of the danger which he incurred; and then, under what exigency he act- ed. That is to say, the exigency legitimately may affect, not only the ques- tion how far he appreciated or ought to have appreciated the danger but also how far he could run a risk known to be greater than prudently could be incurred under ordinary circumstances without losing his right to re- cover in case he was hurt."

Judge Macfarlane, speaking for the Supreme Court of Missouri in Dickson v. Omaha & St. L. Ry. Co., 124 Mo. 140, 27 S. W. 476, 25. L. R. A. 320, 46 Am. St. Rep. 429, lays down the rule that in cir- cumstances of emergency a person is not chargeable with negligen if he fails to appreciate the safest and best course to pursue Jud, Barclay, speaking for the Supreme Court in Schroeder v. C. & A. Ry. Co., 108 Mo. 322, 18 S. W. 1094, 18 L. R. A. 827, says that. ordinary care to avoid an injury by a person must "be judged from

the standpoint furnished by the facts of the particular case, and also by considering the exigency under which he acted."

The foregoing cases do not state any new rule, but rather afford a clear statement of a necessary corollary of the old one, which we daily apply in defining ordinary care to be that care which ordinarily prudent persons exercise under similar circumstances. As ordinary care in a given case is measured by what ordinarily prudent persons do under similar circumstances, it follows necessarily that the circumstances of a given case not only may, but must, be considered in determining the issue of ordinary care as involved in that case. In view of the peculiar facts of this case and the applicatory law, I believe a great injustice has been done to the plaintiff in error by the judgment of the majority. Adherence to the letter of the "look and listen" doctrine has superseded the proper regard for its spirit, and the function of a jury in a case peculiarly appropriate for its exercise has been usurped by the court.